IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO. 3:22-cv-11072- |
| *ex. rel.* WADE RINER | § | TKW-ZCB |
| co | § | |
| | § | |
| Plaintiff, | § | |
| | § | <u>RELATOR WADE</u> |
| | § | <u>RINER'S ORIGINAL</u> |
| | § | <u>COMPLAINT</u> |
| v. | § | |
| | § | |
| | § | |
| | § | |
| | § | <u>FILED UNDER SEAL</u> |
| WATERCOLOR COMMUNITY | § | PURSUANT TO 31 U.S.C. |
| ASSOCIATION, INC., ET AL. | § | § 3730 (b)(2) |
| | § | |
| Defendants. | § | |
| | § | |
| | | <u>JURY TRIAL DEMANDED</u> |

**<u>RELATOR WADE RINER'S FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION: COVID-19, PPP, AND THE OPPORTUNISTS ..................................... 1

II.    PARTIES ............................................................................................................ 3

III.    RESPONEAT SUPERIOR AND VICARIOUS LIABILITY ................................................ 5

IV.    JURISDICTION AND VENUE ................................................................................. 5

V.    DISCLOSURES .................................................................................................... 6

VI.    THE PAYCHECK PROTECTION PROGRAM .............................................................. 6

VII.    DEFENDANTS' FRAUD ....................................................................................... 13

        A.    DEFENDANTS FALSELY REPRESENTED QUALIFICATIONS FOR PPP LOANS. .................................................................................... 14

        B.    DEFENDANTS FALSELY REPRESENTED THEIR NEED FOR PPP LOANS. .................................................................................... 17

        C.    DEFENDANTS' FALSE REPRESENTATIONS APPEARED IN PPP APPLICATIONS. ............................................................................ 22

VIII.    ACTIONABLE CONDUCT BY DEFENDANTS ............................................................ 28

        A.    FALSE CLAIMS ACT .................................................................... 28

        B.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT ............................ 29

        i.    Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) ........... 29

        ii.    Making or Using—or causing to be made or used—False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) ................ 30

        C.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT ARE MATERIAL. .................................................................................. 30

IX.    CAUSES OF ACTION ......................................................................................... 32

        A.    COUNT I – PRESENTATION OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(A)(1)(A)) ..................................................... 32

**B.**    COUNT II – PRESENTATION OF FALSE OR FRAUDULENT CLAIMS
(31 U.S.C. § 3729(A)(1)(A)) .......................................................... 34

X.    TABLE OF EXHIBITS ................................................................................. 35

XI.    PRAYER FOR RELIEF ................................................................................. 37

XII.    DEMAND FOR JURY TRIAL ...................................................................... 37

Plaintiff/Relator Wade Riner ("Relator" or "Riner") brings this action pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729–32, and seeks to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States of America and on his own behalf. Relator respectfully shows the following:

## I.    INTRODUCTION: COVID-19, PPP, AND THE OPPORTUNISTS

1.      After the crisis of the COVID-19 Coronavirus pandemic began, Congress passed the Coronavirus Aid, Relief, and Economic Security Act—more commonly referred to as the "CARES Act"—in part to provide emergency relief to small businesses facing payroll difficulties and other concerns meeting their bottom-line in the midst of the pandemic. As part of the CARES Act, Congress created the Paycheck Protection Program ("PPP") in March 2020, to provide emergency financial support to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic.  The PPP authorized billions of dollars in forgivable loans to small businesses struggling to pay employees and other business expenses. Throughout 2020 and 2021, PPP loan applicants were required to certify that they were eligible to receive a PPP loan. Unfortunately, this aid also attracted opportunistic actors who received aid that Congress never intended.

2.      To qualify for the PPP, businesses had to certify to the United States Small Business Administration that they are qualified to receive the interest-free loan, that their loan request is necessary for continued operation, and that they will use funds only to pay payroll expenses, rent, mortgage, interest, or utilities during a covered period.

3.      The PPP loans were originally intended to help traditional small businesses make it through the economic downturn that came as a consequence of the pandemic, but others wanted in.

1

4.     Numerous trade groups and similar associations lobbied Congress to be added as entities eligible for PPP loans. Among those groups were community associations, which include housing cooperatives, condominium associations, and property owner associations.

5.     In December 2020, Congress passed and the President signed into law amendments to the CARES Act (the Economic Aid Act) that allowed housing cooperatives to apply for PPP loans. Condominium associations, homeowners associations, and other community associations were not included in the amendment. The list of eligible recipients only expanded one more time near the end of the final PPP application period—when President Biden signed the American Rescue Plan Act of 2021 into law on March 11, 2021, which included most 501(c) organizations as "additional covered nonprofit entities" but explicitly excluded 501(c)(4) organizations (the only 501(c) status for which a homeowners association or condominium association might be eligible).

6.     Despite the industry's recognition that Congress had not allowed their participation in the PPP, numerous community associations, particularly condominium associations, homeowners associations, and other not-for-profit organizations, applied for PPP loans anyway, falsely certifying to the United States that they were eligible for funding and that they needed the loans after also certifying in the Application that "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them." They did so even though they had millions of dollars in revenue every year that was not reliant on the unpredictable swings of the economy but instead on a simple tool: assessments to their wealthy membership. Rather than obtain PPP loans as the intended American businesses in need, Defendants approached the program as opportunists. Defendants are all "not-for-profit" entities under Florida law—established to serve as homeowners associations and explicitly *not* to obtain pecuniary gain—and are funded primarily by assessments from economically secure (and often

wealthy) owners. That is, Defendants are quite different from the type of entities Congress meant to assist with creating PPP loans. By fraudulently applying for these PPP loans, the rich got richer while depriving needy Americans of the boost that Congress sought to give them.

7.      In total, the Defendant not-for-profit condominium associations and not-for-profit homeowners associations fraudulently applying for PPP loans received millions of dollars in forgivable funding, directly depriving the United States of millions of dollars and preventing worthy and needy small businesses from receiving congressionally approved loans.

8.      As Acting Assistant Attorney General Brian M. Boynton has explained, "PPP loans were intended to provide critical relief to small businesses so that they could pay employees and maintain operations," and the Department of Justice is "committed to pursuing those who knowingly violated the requirements of the PPP or other Covid-19 assistance programs and obtained relief funds to which they were not entitled"—particularly, with the assistance of *qui tam* relators.

## II.   PARTIES

9.      Plaintiff/Relator Wade Riner is a regular homeowner and investor. A corporation with which Riner is the officer and principle in turn owns multiple homes in Florida. Through ownership of these homes, Riner is a member of the Hunters Run Property Owners Association, Inc., and he was a member of the Boca West Master Association, Inc. until the fourth quarter of 2021. Through his membership in these homeowners associations in Florida, he learned that his homeowners associations had applied for millions of dollars of federal relief through PPP loans. He separately realized, though, that they applied for these loans despite the fact that they were not "business interests," as required by the CARES Act. Riner subsequently concluded that his own homeowners associations defrauded the United States government by falsely certifying they were

eligible for PPP loans that they were not, in fact, eligible for. Riner then learned that many other similar entities had applied for and obtained such loans, too. From his own knowledge and other information he learned, Riner concluded that many of these other entities also defrauded the government, because they were not qualified to obtain these loans. Riner further investigated and also learned that these associations did not need these loans. Although the mere fact that these entities received PPP loans became publicly available, Riner discovered the fraud—and, critically, the falseness of the entities' PPP applications—on his own. Riner is intimately familiar with the finances and organization of these particular homeowners associations as well as homeowners associations in general, including details of how such community associations are governed and how they raise funds through their membership and other sources of liquidity, and this knowledge assisted him in discovering the fraud presented here.

10.     Defendants are all various not-for-profit entities.[1] Although there may be some subtle differences in the Defendants' governing documents, Defendants can generally be categorized in one of several ways: as a not-for-profit homeowners association, a not-for-profit condominium association, or other not-for-profit community associations.

11.     Watercolor Community Association, Inc. ("Watercolor") is a not-for-profit property owner's association located at 133 Pine Grove Circle, Santa Rosa Beach, FL.

12.     Holiday Surf and Racquet Club Condominium Association, Inc. ("Holiday Surf and Racquet") is a not-for-profit condominium association located at 510 Gulf Shore Rd., Destin, FL.

13.     Jetty East Condominium Association, Inc. ("Jetty East") is a not-for-profit condominium association located at 500 Gulf Shore Dr., Destin, FL.

---

[1]     Since filing the original complaint, Relator has moved to dismiss Dunes of Panama from this case. (*See* Dkt. 82, 99, 100). Through this amended complaint, Relator is also no longer pursuing any claims against Edgewater Beach Owners Association, Inc.

14.     Laketown Wharf Resort Community Association, Inc. ("Laketown Wharf") is a not-for-profit community association located at 9902 Thomas Dr., Panama City, FL.

15.     One Seagrove Place Owner's Association, Inc. ("One Seagrove") is a not-for-profit community association located at 4100 E. Country Highway 30a, Santa Rosa Beach, FL.

16.     Pinnacle Port Community Association, Inc. ("Pinnacle Port") is a not-for-profit community association located at 23223 Front Beach Rd., Panama City Beach, FL.

17.     Rosemary Beach Property Owners Association, Inc. ("Rosemary Beach") is a not-for-profit property owner's association located at 200 West Water St., Rosemary Beach, FL.

18.     Seacrest Beach II Owners Association, Inc. ("Seacrest Beach") is a not-for-profit community association located at 1 Seacrest Beach Blvd., Inlet Beach, FL.

19.     St. George Plantation Owners Association, Inc. ("St. George") is a not-for-profit property owner's association located at 1712 Magnolia Road, St. George Island, FL.

### III.    RESPONEAT SUPERIOR AND VICARIOUS LIABILITY

20.     Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents who at all times acted on behalf of the named Defendants and within the course and scope of their employment or agency.

### IV.    JURISDICTION AND VENUE

21.     Jurisdiction and venue are proper in the Northern District of Florida, pursuant to the False Claims Act (31 U.S.C. §§ 3729–33), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. §§ 3729–30, and the Defendants can be found in this district. Because Defendants can be found in this state, personal jurisdiction is also proper.

## V.    DISCLOSURES

22.    As required by 31 U.S.C. §§ 3730(b) and (e), Relator submitted and Original Disclosure Statement to the Attorney General of the United States and the United States Attorney for the Northern District of Florida, as well as all material evidence and information, prior to filing and serving the Original Complaint.

## VI.    THE PAYCHECK PROTECTION PROGRAM

23.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281, created the PPP, initially making $349 billion in forgivable loans available to small businesses impacted by the COVID-19 pandemic. The U.S. Small Business Administration ("SBA") administers the PPP, promulgates the rules and regulations governing the PPP, and guarantees all PPP loans made by lenders.

24.    The PPP allowed small businesses (less than 500 employees) to obtain forgivable loans of up to $10 million, at 1% interest, to cover payroll costs, rent, mortgage interest, utilities, and other overhead expenses for a "covered period." CARES Act § 1102(a)(2)(36)(D)–(E), 134 Stat. at 288–90.

25.    PPP loans were processed and approved by qualified lenders that the SBA approves. Lenders issued PPP loans without the SBA's prior review or express and individualized approval, but they agreed to be responsible for determining borrower eligibility under the SBA's criteria.  They were "deemed to have been delegated authority by the [SBA] Administrator to make and approve covered loans." CARES Act § 1102(a)(2)(36)(F)(ii), 134 Stat. at 290.

26.    For processing the PPP loans, the SBA reimbursed participating lenders with a processing fee equal to the amount of 5% of loans up to $350,000; 3% of loans between $350,000 and $2,000,000; and 1% on loans of at least $2,000,000. *See* CARES Act § 1102(a)(2)(36)(P), 134

Stat. at 293. Additionally, although the lenders funded the PPP loans with their own funds, the SBA 100% guaranteed these loans.

27.    PPP loans are also subject to complete forgiveness. CARES Act § 1106, 134 Stat. at 297–302. And within 90 days of which forgiveness is given, the SBA remits to the lender the full amount of forgiveness, plus any accrued interest. *Id.* § 1106(c)(3), 134 Stat. at 298.

28.    The PPP was a program under the Small Business Act, Section 7(a). Generally speaking, a key eligibility requirement for Section 7(a) SBA loans is that the applicant be a business operating for profit.

29.    Pursuant to the CARES Act, PPP loans were originally available only to a "business concern, nonprofit organization, veterans organization,[] Tribal business," or sole proprietorship that employed no more than 500 employees. *See* CARES Act § 1102(a)(2)(36)(D), 134 Stat. at 288. Nonprofit-organization eligibility, however, was limited to 501(c)(3) organizations that are tax exempt. *Id.* § 1102(a)(2)(36)(A)(viii).

30.    Eligibility for PPP is also spelled out in Interim Final Rule #1 published in the Federal Register on April 15, 2020 (answering the question, "How do I determine if I am ineligible?"). As it stated: "Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10 Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible." 85 Fed. Reg. 20812.

31.    Meanwhile, 13 CFR § 120.100 states that an entity must be "organized for profit" to be eligible for SBA loans (including PPP loans), and 13 CFR § 120.110 specifically states that "non-profit businesses" are ineligible. 13 CFR § 120.110 excludes other types of entities, including "[p]rivate clubs and businesses which limit the number of memberships for reasons other than

7

capacity." 13 CFR § 120.110(i). As stated in the administrative notes interpreting the rationale behind 120.110(i), "to be eligible for SBA financial assistance, the products and services of a business must be available to the general public." 60 Fed. Reg. 64356, 1995 WL 739731, at *64360 n.3 (Dec. 15, 1995). The clear intent of Congress and the SBA, therefore, was to limit SBA loans, including PPP loans, to for-profit businesses and not private clubs like housing associations, condominium associations, country clubs, and more.

32.    Applicants for PPP loans were required to certify to a participating SBA-approved lender and to the SBA that they are eligible to receive the loan under the rules in effect at the time of their application. For example, the April 2020 SBA Form 2483 (the PPP application at the time) required applicants to certify as follows:



**Paycheck Protection Program**
**Borrower Application Form**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

33.    The PPP applications also required applicants to certify that the loan request is necessary to support their ongoing operations. As SBA Form 2483 required:

<u>CERTIFICATIONS</u>

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:



       The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

       Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

34.     Recognizing that some applicants might be confused by this economic-uncertainty certification, the SBA provided a "safe harbor" when it issued Interim Final Rule #4 (85 Fed. Reg. 23450 published April 28, 2020) stipulating that "any borrower that applied for a PPP loan and repays the loan in full by May 7, 2020, will be deemed by SBA to have made the required certification in good faith." Interim Final Rule #4 additionally noted that the SBA would give additional guidance before May 14, 2020 concerning this certification, especially in helping PPP borrowers evaluate whether they "may have misunderstood or misapplied the statutory standard." As of May 13, 2020, SBA clarified in its Frequently Asked Questions section of Interim Final Rule # 9, (85 Fed. Reg. 29845 published May 19, 2020) stating that "borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."

35.     PPP applications additionally required applicants' authorized representatives to specifically certify that all information provided on the application is true and accurate in all material respects as well as to certify their understanding that a false statement made in order to obtain a guaranteed loan from the SBA is punishable under the law. Again, from the April 2020 SBA Form 2483:

       I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

36.    Finally, when PPP loan recipients apply for forgiveness of their loan, they must further certify, through their authorized representative, that they have "complied with all requirements in the Paycheck Protection Program Rules," including the statute passed in the CARES Act and the subsequent amendments. From SBA Form 3508S:

**By Signing Below, You Make the Following Representations and Certifications on Behalf of the Borrower:**
The Authorized Representative of the Borrower certifies to all of the below by **initialing** next to each one.

The Borrower has complied with all requirements in the Paycheck Protection Program Rules (Sections 7(a)(36), (7)(a)(37), and 7A of the Small Business Act, the PPP interim final rules, and guidance issued by SBA through the date of this application), including the rules related to:
- eligible uses of PPP loan proceeds;
- the amount of PPP loan proceeds that must be used for payroll costs (including proprietor expenses for Borrowers that applied for loans using SBA Forms 2483-C or 2483-SD-C);
- the calculation and documentation of the Borrower's revenue reduction (if applicable); and
- the calculation of the Borrower's Requested Loan Forgiveness Amount.

Information regarding these requirements may be found in the Form 3508S Instructions and the Paycheck Protection Program Rules.

37.    The PPP was originally funded by Congress with $349 Billion, but the funds were depleted on April 16, 2020—only weeks after the CARES Act passed. On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, 134 Stat. 620, whereby Congress allocated an additional $320 Billion in funding.

38.    Congress further expanded the PPP at the end of the year in the Consolidated Appropriations Act, 2021, Pub. L. 116-260. The Consolidated Appropriations Act, 2021, added $284.5 Billion to the PPP. Additionally, the Act allowed certain entities to obtain "second draw" PPP loans. By May 5, 2021, these additional funds had also been depleted.

39.    One further amendment in the Consolidated Appropriations Act, 2021 made "housing cooperatives" eligible for PPP loans but not homeowners associations, condominium associations, or other not-for-profit organizations. *See* Pub. L. 116-260, § 311(a). This is despite the fact that homeowners-associations and condominium-association groups lobbied Congress for their explicit inclusion. Housing cooperatives are especially distinct from other community associations, too. A housing cooperative is a corporation with stockholders who share ownership

in the same building they dwell in, whereas a homeowners' or condominium association is made up of individual residential owners who each separately contribute to a majority of the organization's income through membership dues, fees, or assessments. *Compare* 15 U.S.C. § 636(a)(36)(xiv) (defining "housing cooperatives" for purposes of PPP loans to mean the same as a "cooperative housing corporation" under 26 U.S.C. § 216(b)), *and* 26 U.S.C. § 216(b) (defining "cooperative housing corporations"), *with* 26 U.S.C. § 528 (defining "homeowners association" and "condominium management association").

40.     Congress expanded the list of eligible recipients one last time near the end of the final PPP application period—when the American Rescue Plan Act of 2021 was signed into law on March 11, 2021 and included most 501(c) organizations as "additional covered nonprofit entities." Yet Congress still explicitly excluded 501(c)(4) organizations—the only 501(c) status for which a homeowners association or condominium association might be eligible. Thus, homeowners associations and condominium associations were still clearly ineligible. And while certain nonprofit country clubs were then eligible for PPP loans, they were only eligible for the final weeks of the application period and only if they met the specific 501(c)(7) tax-exempt status. *See* 86 Fed. Reg. 15083 (explaining that the American Rescue Plan Act changes only "apply to PPP loans approved, and loan forgiveness applications submitted, on or after March 11, 2021").

41.     The eligibility rules relevant to the Defendants for various nonprofit and not-for-profit organizations for PPP loans throughout the history of various congressional actions is summarized as follows:

11

| Entity Type | Eligibility Status & History |
|---|---|
| 501(c)(3) nonprofits | Always eligible (CARES Act) |
| Cooperative Associations | Eligible on or after Dec. 27, 2020 (Economic Aid Act) |
| 501(c)(7) nonprofits | Eligible on or after Mar. 11, 2021 (American Rescue Plan) |
| | |
| 501(c)(4) nonprofits | *Never* eligible |
| Not-for-profit homeowners associations | *Never* eligible |
| Not-for-profit condominium associations | *Never* eligible |
| Not-for-profit country clubs | *Never* eligible |

42. Additionally, for entities that applied for a second-draw PPP loan, they again were required to certify their eligibility under the effective rules. From SBA Form 2483-SD:



**Paycheck Protection Program**
**Second Draw Borrower Application Form**
**Revised March 18, 2021**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.

- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) and the Department of the Treasury (Treasury) implementing Second Draw Paycheck Protection Program Loans under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, and Title V of the American Rescue Plan Act of 2021 (the Paycheck Protection Program Rules).

- The Applicant, together with its affiliates (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business, a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, or an Internet-only news or periodical publisher assigned NAICS code 519130 and engaged in the collection and distribution of local or regional and national news and information, employs no more than 300 employees per location; or (5) if a 501(c)(3) organization, an eligible 501(c)(6) organization, other eligible 501(c) organization, eligible destination marketing organization, employs no more than 300 employees per physical location.

- I will comply, whenever applicable, with the civil rights and other limitations in this form.

- All loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules including the prohibition on using loan proceeds for lobbying activities and expenditures. If Applicant is a news organization that became eligible for a loan under Section 317 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, proceeds of the loan will be used to support expenses at the component of the business concern that produces or distributes locally focused or emergency information. If the Applicant is an Internet-only news or periodical publisher that became eligible for a loan under Section 5001 of the American Rescue Plan Act of 2021, the proceeds of the loan will be used to support expenses at the component of the business or organization that supports local or regional news.

- I understand that SBA encourages the purchase, to the extent feasible, of American-made equipment and products.

- The Applicant is not engaged in any activity that is illegal under federal, state or local law.

43. Additionally, second-draw PPP applications continued to require another certification that all information provided on the application is true and accurate in all material

respects as well as to certify their understanding that a false statement made in order to obtain a guaranteed loan from the SBA is punishable under the law. From SBA Form 2483-SD:



I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

44.     Finally, *qui tam* lawsuits are an appropriate remedy for violations of the PPP rules and regulations. In remarks given on February 17, 2021, for example, Acting Assistant Attorney General Brian M. Boynton explained: "It is clear to me and my colleagues in the Civil Division-and I'm sure to all of you-that the False Claims Act will play a significant role in the coming years as the government grapples with the consequences of this pandemic." As he further pointed out, "[t]he vast majority of the funds distributed under these programs have gone to eligible recipients. Unfortunately, some individuals and businesses applied for-and received- payments to which they were not entitled."  Accordingly, "*qui tams* will continue to be an essential source of new leads, and the Department [of Justice] will continue to rely on whistleblowers to help root out the misuse and abuse of taxpayer funds."

## VII.   DEFENDANTS' FRAUD

45.     Defendants knowingly told the SBA and participating lenders that they were qualified entities to receive PPP loans, even though they are all not-for-profit homeowners associations, condominium associations, or similar entities that do not qualify as qualified entities under Congress's act. They also all knowingly misrepresented their need for these loans. Their fraud deprived the United States of the ability to loan appropriated funds to qualified businesses, as the funding for PPP loans ran out shortly after Defendants applied for their loans.

## A. DEFENDANTS FALSELY REPRESENTED QUALIFICATIONS FOR PPP LOANS.

46.    Defendants' false certification that they were qualified occurred despite them knowing or recklessly disregarding the fact that they were ineligible nonprofit organizations and that not-for-profit organizations like them were not eligible for-profit businesses under SBA Section 7(a) or "business interests" pursuant to the CARES Act or even SBA's guidance and regulations. Defendants were never eligible for SBA Section 7(a) loans, and they also did not meet an exception under the CARES Act or its amendments. In fact, the SBA published—and, upon congressional amendments, updated, FAQs for the PPP loans including an answer for "Who is Eligible"—and neither not-for-profit community associations like housing associations and condominium associations nor even not-for-profit country clubs were *ever* listed in the answer to that question. The only community groups that was ever listed were housing cooperatives, and that was after specific congressional amendments to allow housing cooperatives to apply. Additionally, "non-profit businesses" were explicitly excluded in official guidance, further telling Defendants— who are all non-profit or not-for-profit organizations—that they were ineligible. Additionally, because the associations' lobbyists were fighting for inclusion in the PPP, the Defendants inherently knew that they could not qualify without new amendments by Congress that never materialized. Defendants realized they could slip by rushed bankers and regulators by purporting to be a "business interest" without actually being one.

47.    Defendants also knew they were not "business interests" because they inherently knew that they were not-for-profit organizations and not the type of organization that qualifies as a "business interest" under the CARES Act or Section 7(a).

48.    Watercolor, for instance, is defined as a "not for profit corporation" under its own articles of incorporation. (Exhibit #1). Its articles of incorporation further explain its lack of

business interest: "The Association does not contemplate pecuniary gain or benefit, direct or indirect, to its members." (Exhibit #1). In its Annual Report to the Florida Secretary of State filed in 2020, Watercolor continued to describe itself as a "Not for Profit Corporation," too. (Exhibit #2). Watercolor necessarily knew that it was therefore not a "business interest" under the Act, or at the very least it was deliberately indifferent or reckless to that fact.

49.    Holiday Surf and Racquet is also defined as a "corporation not for profit" under its articles of incorporation. (Exhibit #3). The articles of incorporation require that Holiday Surf and Racquet "shall make no distribution of income to its members, directors or officers." (Exhibit #3). Indeed, "[a]ll funds and the titles of all properties acquired by the Association and the proceeds thereof shall be held in trust for the members." (Exhibit #3). Holiday Surf and Racquet continued to confirm its status as a "Not for Profit" in its annual 2020 report, too. (Exhibit #4). These characteristics make Holiday Surf and Racquet the opposite of a "business interest" under the governing statutes, and it therefore necessarily knew that it was not qualified or was deliberately indifferent or reckless to that fact.

50.    Jetty East is organized as a not-for-profit corporation under the laws of Florida. This is how Jetty East classifies itself in its annual report to the Florida Secretary of State— including the 2020 annual report. (Exhibit #5).

51.    Laketown Wharf is defined as "a corporation not-for-profit" in its articles of incorporation, as well. (Exhibit #6). Specifically, "[t]he Association shall be conducted as a non-profit organization for the benefit of its members." (Exhibit #6). Laketown Wharf confirmed its status as a "Not for Profit Corporation" in its 2020 Annual Report, too. (Exhibit #7).

52.    One Seagrove is organized as a not-for-profit corporation under the laws of Florida. This is how One Seagrove classifies itself in its annual report to the Florida Secretary of State—including the 2020 annual report. (Exhibit #8).

53.    Pinnacle Port is organized as a not-for-profit corporation under the laws of Florida. This is how Pinnacle Port classifies itself in its annual report to the Florida Secretary of State—including the 2020 annual report. (Exhibit #9).

54.    Rosemary Beach's articles of incorporation, meanwhile, make clear that the entity's powers only extend as far as the "rights and powers … conferred on not for profit corporations." (Exhibit #10). Specific limitations on Rosemary Beach's activities make this clearer, too—as net earnings may not be distributable to any member, and no member is to be entitled to any distribution of Rosemary Beach's assets even if it is dissolved as an entity. (Exhibit #10). Also, in its annual report, Rosemary Beach confirmed its status as a "Not for Profit Corporation." (Exhibit #11).

55.    Seacrest Beach is organized as a not-for-profit corporation under the laws of Florida. This is how Seacrest Beach classifies itself in its annual report to the Florida Secretary of State—including the 2020 annual report. (Exhibit #12).

56.    St. George's articles of incorporation likewise limits its powers by Florida's not-for-corporation laws. (Exhibit #13). If St. George is ever dissolved, assets are likewise only distributed to either a public agency or to a non-profit corporation. (Exhibit #13). And like the other Defendants, St. George also in 2020 confirmed its status as a "Not for Profit Corporation" in its Annual Report to the Florida Secretary of State. (Exhibit #14).

57.    Given all of the Defendants' core status as not-for-profit corporations in Florida, they all knew, were deliberately indifferent to, or were reckless to the fact that they were not

"business interests" under the CARES Act and SBA Section 7(a). After all, such entities may not be organized "for pecuniary profit," and by definition they are generally barred from distributing any income or profit to its members, directors, or officers. Fla. Stat. §§ 617.0301, 617.01401. Additionally, none of the Defendants operated under the particular 501(c)(3) tax-status designation that represented a PPP exemption to the typical business-interest requirement for small-business loans. Accordingly, the Defendants all knowingly misrepresented their qualifications to the United States when they said that—contrary to the basic core facts of their being—they were qualified to receive PPP loans.

## B. DEFENDANTS FALSELY REPRESENTED THEIR NEED FOR PPP LOANS.

58.    Defendants' other false certifications—that economic uncertainty made the PPP loans necessary to support their ongoing operations—were in bad faith, given the strong finances of Defendants and how they could raise money. The SBA required applicants to make this certification in good faith and admonished applicants to consider "their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." The SBA even gave an example of a business that could *not* make this certification: "it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith."

59.    There is no circumstance under which a homeowners' association or condominium association could certify in good faith that they do not have access to other sources of liquidity to support their ongoing operations. While Defendants were not public companies, they still had substantial value of their own and access not only to capital markets but also a more readily available source of funds—the wealthy members and assets. Unlike businesses (who rely on sales by voluntary consumers, or other voluntary business) or even 501(c)(3) nonprofits (who rely on

voluntary donations), housing associations, condominium associations, and not-for-profit country clubs do not rely on voluntary funding subject to economic whims—instead, they rely on mandatory assessments and/or dues and fees from their membership. Defendants' members have substantial resources available to them, often with net worth of tens of millions of dollars, and it would not have been a hardship to raise their assessments and/or dues and fees in order to continue operations even assuming the highly doubtful proposition that the pandemic represented a hardship on these defendants.

60.    Furthermore, because all these associations are created as not-for-profits under Florida law, they have special authority and powers including the power to "make contracts and guaranties, incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds, and other obligations, and secure its obligations by mortgage and pledge of all or any of its property, franchises or income." Fla. Stat. § 617.0302. Homeowners associations and condominium associations have the additional powers to assess a sum of money which if not paid by the owner of a parcel, can result in a lien against the parcel—a further ability to raise money beyond simple assessment powers. *See* Fla. Stat. §§ 720.301, 720.308, 718.116. These powers are further reason that Defendants' false certifications that they needed the PPP loans were thus in knowing or deliberate ignorance of their true financial situation.

61.    Watercolor knew it did not need a PPP loan. Watercolor is a particularly wealthy association in Walton County. According to the Walton County Property Appraiser, in 2020, over *100* Watercolor homes sold for an average price of *$2.3 million*. A list of appraisal values from the appraisal district shows that many properties are worth millions of dollars more, too. (Exhibit #15). That list also shows that many of the owners have addresses outside of Florida—indicating that these multi-million-dollar homes are *second* homes. (Exhibit #15). And the appraisal values

have only gone up since the COVID-19 Pandemic. Additional membership assessments from clearly well-off and thriving members could have easily funded any pandemic shortfall. As seen in a map of the Watercolor resort (Exhibit #16), Watercolor is a sprawling community that necessarily has significant resources to maintain its status. Unlike businesses (who rely on sales by voluntary consumers, or other voluntary business) or even 501(c)(3) nonprofits (who rely on voluntary donations), housing associations and condominium associations do not rely on such voluntary funding subject to economic whims—instead, they rely on mandatory assessments and/or dues and fees from their membership. Defendants' members are particularly wealthy, often with net worth of tens of millions of dollars, and it would not have been a hardship to raise their assessments and/or dues and fees in order to continue operations even assuming the highly doubtful proposition that the pandemic represented a hardship on these defendants. Given all of this information that Watercolor must have known, certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

62.     Holiday Surf and Racquet is experienced in both obtaining third-party financing and in using its assessment ability to raise funds for various projects. In fact, it has combined the two tactics: on multiple occasions, it has assigned assessments to a banking institution in order to satisfy a previous financing obligation, as evidenced in publicly filed documents. (Exhibit #17). Given this information that Holiday Surf and Racquet must have known, along with its other abilities to raise funds, certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

63.     Jetty East is also experienced in both obtaining third-party financing and in using its assessment ability to raise funds for various projects. It has also combined the two tactics: on

multiple occasions, it has assigned assessments to a banking institution in order to satisfy a previous financing obligation, as evidenced in publicly filed documents. (Exhibit #17). Given this information that Jetty East must have known about itself, along with its other abilities to raise funds, certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

64.    Laketown Wharf is also experienced in both obtaining third-party financing and in using its assessment ability to raise funds for various projects. It has also combined the two tactics: on multiple occasions, it, too, has assigned assessments to a banking institution in order to satisfy a previous financing obligation, as evidenced in publicly filed documents. (Exhibit #19). Additionally, when Laketown Wharf approved its budget for 2020, it boasted $580,000 in reserves (Exhibit #20)—a substantial fund that it could have pulled from, rather than the public fisc through a PPP loan. Moreover, its budget shows that almost all of its income for 2020 would come from association dues—a fixed income from its wealthy membership that would not be affected by economic uncertainty. (Exhibit #20). Given this information that Laketown Wharf must have known about itself, along with its other abilities to raise funds, certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

65.    One Seagrove has a demonstrated ability to raise funds for itself through conventional means. For example, One Seagrove has a history of multiple significant financing opportunities for other projects, as publicly filed documents show. (Exhibit #21). Given this information that One Seagrove must have known about itself, along with its other abilities to raise funds internally (such as through assessments on its wealthy members), certifying that economic

uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

66.    Pinnacle Port is also experienced in both obtaining third-party financing and in using its assessment ability to raise funds for various projects. It has also combined the two tactics: on multiple occasions, it, too, has assigned assessments to a banking institution in order to satisfy a previous financing obligation, as evidenced in publicly filed documents. (Exhibit #22). Pinnacle Port is not just an average association with average owners, but rather an expansive one with wealthy owners who could afford additional assessments—Pinnacle Port spans 26 acres, and Pinnacle Port boasts having a "fully funded reserve" from which it could draw in times of economic uncertainty. Given this information that Pinnacle Port must have known about itself, along with its other abilities to raise funds, certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

67.    Rosemary Beach has a demonstrated ability to raise funds for itself through conventional means. For example, Rosemary Beach has a history of multiple significant financing opportunities for other projects, as publicly filed documents show. (Exhibit #23). Moreover, as appraisal records show, Rosemary Beach's properties are all worth millions of dollars—indicating the wealth of its individual and entity members from which it can obtain further assessments to fund its work when it needs to. (Exhibit #24). Rosemary Beach is not just an average homeowners association with average members, but it is one that maintains multiple pools, a bocce court, a racquet club, and even a butterfly garden. Indeed, the appraisal list also shows that many of the owners have addresses outside of Florida—indicating that these multi-million-dollar homes are *second* homes. (Exhibit #24). And the appraisal values have only gone up since the pandemic.

Given this information that Rosemary Beach must have known about itself, along with its other abilities to raise funds internally (such as through assessments on its wealthy members), certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

68.    Seacrest Beach also can take advantage of assessments to fund any work it needs to do, especially with 400 luxury beach properties. It even operates a tram service on its property. Given this information that Seacrest Beach must have known about itself, along with its other abilities to raise funds internally (such as through assessments on its wealthy members), certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

69.    St. George has a demonstrated ability to raise funds for itself through conventional means. For example, St. George has obtained significant financing for other projects, as publicly filed documents show. (Exhibit #25). Moreover, St. George is not just any average homeowners association but instead a wealthy association that has extra space to take advantage of assessments from its members—after all, it is a *1,200-acre* gated community with over 500 homes. Given this information that St. George must have known about itself, along with its other abilities to raise funds internally (such as through assessments on its wealthy members), certifying that economic uncertainty made it *necessary* to obtain a PPP loan was certainly knowingly false—or at the very least deliberately ignorant of the truth or reckless.

## C.  Defendants' False Representations Appeared in PPP Applications.

70.    Despite Defendants' knowledge (or, at the very least, deliberate ignorance or recklessness) of their lack of qualifications for PPP loans and their lack of any need for PPP loans, they nevertheless applied for PPP loans making false certifications.

71.     The Defendants' false certifications to the SBA and the lenders were material, because the SBA and lenders relied on the honesty of applicants to process PPP loans as quickly as possible in order to get relief to American businesses as Congress intended.

72.     Moreover, building on this fraud, the Defendants have already applied for loan forgiveness from the United States and had their loans forgiven in full, thus directly depriving the United States of the full amount of the loans and the interest accrued on the loans. The forgiveness actually given (and forgiveness potential for entities that have not applied) is equal to hundreds of thousands if not millions of dollars per Defendant.

73.     Some of the Defendants went even further and applied for a *second* loan, yet again fraudulently and falsely claiming that they were eligible entities under the CARES Act, even though they are just homeowners associations or condominium associations.

74.     The damages suffered by the United States extended beyond the simple amount of the loans. The damages also include the Government's other incidental expenses supporting the particular PPP loans. For example, Defendants induced the United States to pay fees to banks and other financial institutions in order to execute these fraudulent loans.

75.     Each Defendant knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." They also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Defendants each applied for and received loans in violation of the FCA as summarized in the following table:

| Defendant | # of Loans Rec'd | Loan(s) Amount | Date Loan(s) Approved | Loan Forgiven? | Amount of Loan Forgiven |
|---|---|---|---|---|---|
| Watercolor Community Association, Inc (https://www.mywatercolorcommunity.com) | 1 | $264,123 | 4/30/2020 | Yes | $266,345 |
| Holiday Surf And Racquet Club Condominium Association, Inc. (https://www.holidaysurf.com) | 2 | $123,072 $123,072 | 4/28/2020 2/11/2021 | Yes Yes | $123,879 $123,986 |
| Jetty East Condominium Association Inc. | 2 | $339,009 $323,857 | 4/28/2020 4/2/2021 | Yes Yes | $340,713 $325,596 |
| Laketown Wharf Resort Community Association, Inc. | 1 | $190,692 | 04/16/2020 | Yes | $192,991 |
| One Seagrove Place Owner's Association, Inc. (https://www.oneseagroveplace.com) | 1 | $166,997 | 04/28/2020 | Yes | $167,851 |
| Pinnacle Port Community Association, Inc. | 1 | $187,180 | 04/30/2020 | Yes | $188,116 |
| Rosemary Beach Property Owners Association, Inc. | 1 | $375,200 | 04/14/2020 | Yes | $377,174 |
| Seacrest Beach II Owners Association, Inc. | 1 | $182,757 | 04/29/2020 | Yes | $183,970 |
| St George Plantation Owners Association Inc. (https://www.stgeorgeplantation.com) | 1 | $154,687 | 04/13/2020 | Yes | $155,555 |

76.     All of the loan applications were made shortly before approval—for all single loans and initial loans, that was in March or April 2020 deep in the heaviest moment of the pandemic as Congress hoped to save businesses truly in need. Defendants also applied for their forgiveness in the period after while the economy and public fisc were still recovering from the shocks of the pandemic.

77.     Specifically, Watercolor applied for and received a PPP loan of $264,123, approved on April 30, 2020. Watercolor applied for its loan with Bank of America. In Watercolor's application, Watercolor knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the

24

Applicant." Watercolor already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $266,345 (including interest).

78.    Holiday Surf and Racquet applied for and received a PPP loan of $123,072, approved on April 28, 2020. Holiday Surf and Racquet applied for and was approved for a second PPP loan of $123,072, approved on February 11, 2021. Holiday Surf and Racquet applied for its loans with Cadence Bank. In Holiday Surf and Racquet's applications, Holiday Surf and Racquet knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Holiday Surf and Racquet already applied for forgiveness for its first loan, and the United States forgave the first loan in the amount of $123,879 (including interest). Holiday Surf and Racquet applied for forgiveness for its second loan, and the United States forgave the second loan in the amount of $123,986 (including interest).

79.    Jetty East applied for and received a PPP loan of $339,009, approved on April 28, 2020. Jetty East applied for and was approved for a second PPP loan of $323,857, approved on April 2, 2021. Jetty East applied for its loans with Trustmark National Bank. In Jetty East's applications, Jetty East knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Jetty East already applied for forgiveness for its first loan, and the United States forgave the first loan in the amount of $340,713 (including interest). Jetty East applied for forgiveness for its second loan, and the United States forgave the second loan in the amount of $325,596 (including interest).

80. Laketown Wharf applied for and received a PPP loan of $190,692, approved on April 16, 2020. Laketown Wharf applied for its loan with Cadence Bank. In Laketown Wharf's application, Laketown Wharf knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Laketown Wharf already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $192,991 (including interest).

81. One Seagrove applied for and received a PPP loan of $166,997, approved on April 28, 2020. One Seagrove applied for its loan with Trustmark National Bank. In One Seagrove's application, One Seagrove knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." One Seagrove already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $167,851 (including interest).

82. Pinnacle Port applied for and received a PPP loan of $187,180, approved on April 30, 2020. Pinnacle Port applied for its loan with Trustmark National Bank. In Pinnacle Port's application, Pinnacle Port knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Pinnacle Port already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $188,116 (including interest).

83. Rosemary Beach applied for and received a PPP loan of $375,200, approved on April 14, 2020. Rosemary Beach applied for its loan with Regions Bank. In Rosemary Beach's

application, Rosemary Beach knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Rosemary Beach already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $377,174 (including interest).

84.    Seacrest Beach applied for and received a PPP loan of $182,757, approved on April 29, 2020. Seacrest Beach applied for its loan with Trustmark National Bank. In Seacrest Beach's application, Seacrest Beach knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Seacrest Beach already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $183,970 (including interest).

85.    St. George applied for and received a PPP loan of $154,687, approved on April 13, 2020. St. George applied for its loan with PeoplesSouth Bank. In St. George's application, St. George knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." St. George already applied for forgiveness for its loan, and the United States forgave the loan in the amount of $155,555 (including interest).

## VIII.  Actionable Conduct by Defendants

### A. False Claims Act

86.    This is an action to recover damages and civil penalties on behalf of the United States and the Relator arising from false or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.

87.    The FCA provides that any person who:

(A) knowingly presents, or causes to be presented, a false claim or fraudulent claim for approval; [or]
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

…

is liable to the Government for a civil penalty not less than $11,665 and not more than $22,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

*See* 31 U.S.C. § 3729(a)(1).

88.    The FCA defines "claim" as:

(A) [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(31)    provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. …

31 U.S.C. § 3729(b)(2).

28

89.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

90.     Based on these provisions, Relator Riner, on behalf of the United States and on his own behalf, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**B.  DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT**

**i.     Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

91.     In 2020 and 2021, Defendants knowingly presented false and fraudulent claims for payment and approval directly to their lenders, deputized agents of the United States government, which falsely stated that they were eligible entities for PPP loans and that they needed the loans in order to support their ongoing operations. The falseness of these claims was exacerbated when Defendants applied for forgiveness of their loans and falsely certified that they complied with all the requirements of the PPP rules.

92.     Due to Defendants' actions, Defendants collectively borrowed millions of dollars of forgivable loans that, even if paid back, are also set at a below-market interest rate. These loans were disbursed at the expense of countless United States businesses who qualified for PPP loans but could not apply because Congress's funding ran out. Additionally, the United States has paid millions of dollars to lenders for the forgiven loans, which is now lost. Accordingly, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

      **ii.**      **Making or Using—or causing to be made or used—False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

93.     In 2020 and 2021, Defendants made, use, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

94.     Defendants knew that their applications falsely certified that they were entities eligible to receive PPP loans and that they falsely certified that the PPP loans were necessary to support ongoing operations. Beyond Defendants' own direct claims, Defendants' false statements knowingly caused these false claims, which were material to the lenders' eventual claims to the United States for additional interest and loan-forgiveness reimbursement.

95.     Due to Defendants' actions, Defendants collectively borrowed millions of dollars of forgivable loans that their lenders' then received millions of dollars in payments for administering and reimbursing. The United States disbursed this money to the lenders at the expense of countless United States businesses who qualified for PPP loans but could not apply because Congress's funding ran out. Additionally, the United States has paid millions of dollars to lenders for the forgiven loans, which is now lost. Accordingly, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**C. Defendants' Violations of the False Claims Act are Material.**

96.     A false or fraudulent claim under subsection (a)(1)(A) or a false record or statement under subsection (a)(1)(B) subjects a defendant to liability if it is material. The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

97.     The United States set up a multi-part process of reliance on others in order to expeditiously execute the PPP and keep the economy on track despite the COVID-19 Pandemic.

First, Congress and the SBA authorized certain lenders to issue PPP loans without the Government's prior review or express approval. Second, although lenders were delegated the responsibility for determining borrower eligibility, the lenders were directed to use forms promulgated by the SBA that included numerous certifications—including a certification of eligibility.

98.    The lenders—and thus by extension the United States Government—relied heavily on these certifications. Indeed, when the PPP was originally funded with $349 Billion, those funds were depleted less than three weeks after the CARES Act first passed. Lenders and the United States Government instinctively relied on applicants' promises of eligibility, particularly when no data submitted on the application obviously indicated ineligibility.

99.    In particular, to process loans so quickly, lenders utilized an automated tool that compared loan data against publicly available information and identified anomalies that may indicate non-compliance purely based on this data. *See* SBA Procedural Notice, No. 5000-20092 (Feb. 10, 2021).[2] This data was largely limited to information about the number of employees and payroll size of applicant companies, which were key components to qualifications as well. The automated tool's focus on this data, however, meant that qualifications such as the fact that only certain types of entities ("business interests" and certain specified other organizations) were less noticeable and more tied to applicants' certification that they qualified for the PPP loan in the first instance.

100.    The SBA sometimes conducted additional data analysis beyond the automated tool in order to identify noncompliant applicants. But again, their data analysis was limited to the data

---

[2]    *Available at* https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20092%20-%20Revised%20PPP%20Procedures%20to%20Address%20Hold%20Codes-508.pdf.

available and necessarily was unable to catch entities that applied for PPP loans but were not "business interests" or other qualified organizations. Again, the SBA relied on the certifications of applicants that they were qualified for PPP loans.

101.    By making false and fraudulent misrepresentations that they were qualified for PPP loans and that they complied with all PPP requirements, the Defendants here took advantage of the automated tool and data analyses used by lenders and the United States Government in order to defraud those institutions. Defendants' certifications of qualification and compliance, notwithstanding their knowledge that they did not qualify due to their homeowners association and condominium association and not-for-profit country-club statuses, not only had the natural tendency to influence the award and forgiveness of PPP loans but in fact did so. Defendants' fraudulent and false certifications specifically evaded the compliance measures used by the United States Government and participating lenders. Had Defendants told the truth, and noted that they lacked qualification (or even that their qualifications were questionable) due to their homeowners association or condominium association or not-for-profit country-club status, they would not have received PPP loans or forgiveness for those loans.

## IX.    CAUSES OF ACTION

### A.  COUNT I – PRESENTATION OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(A)(1)(A))

102.    Relator alleges and incorporates by reference each and every allegation contained in paragraphs 1–89, 90–91, and 95–100 of this Complaint.

103.    In 2020 and 2021, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States Government for PPP loans and forgiveness of their PPP loans.

104.    Specifically, Defendants submitted or caused the submission of false or fraudulent claims when they applied for PPP loans and falsely and fraudulently stated that they were eligible entities for PPP loans and that they needed the loans in order to support their ongoing operations, even though they knew that they were ineligible and that they did not need the loans to support their ongoing obligations. Defendants were ineligible subject to SBA Section 7(a), generally, as well as the CARES Act and the Small Business Administration's guidance and regulations, more specifically.

105.    The false PPP applications were "claims" under the FCA because they were "request[s] or demand[s] … for money or property … that" were "presented to an officer, employee, or *agent* of the United States." 31 U.S.C. § 3729(b)(2)(A)(i) (emphasis added). Indeed, they were requests for money submitted directly to financial institutions as agents of the United States. Alternatively, the PPP applications were claims because the financial institutions were "contractor[s], grantee[s], or other recipient[s]" of money who would be "reimburse[d] … for any portion of the money or property which [wa]s requested or demanded." *Id.* § 3729(b)(2)(A)(ii).

106.    Defendants also submitted or caused submission of claims when they applied for forgiveness of their PPP loans and falsely and fraudulently certified that they complied with all the requirements of the PPP Rules, even though they knew they did not.

107.    The applications for forgiveness were likewise additional claims because they further "request[ed] or demand[ed]" money or property from the United States, similar to the initial PPP loan applications. *See* 31 U.S.C. § 3729(b)(2)(A).

108.    The United States Government, unaware of the material falsity of the claims made or caused to be made by Defendants, approved, paid, and participated in payments made by the

Government's fiscal intermediaries for loans that were not allowed and in loan forgiveness that otherwise was not allowed.

109.    By reason of these payments, approvals, and loan forgivenesses, the Government has been damaged in an amount yet to be determined. Accordingly, the United States suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each presentment of a false claim.

**B.  COUNT II – PRESENTATION OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(A)(1)(A))**

110.    Relator alleges and incorporates by reference each and every allegation contained in paragraphs 1–89, 92–94, and 95–100 of this Complaint.

111.    In 2020 and 2021, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

112.    Defendants' statements of eligibility in their PPP applications were false. Defendants knew that these statements were false because Defendants knew that they were not business entities eligible to receive PPP loans.

113.    Defendants' statements in their PPP applications that they needed the loans in order to support their ongoing operations were false. Defendants knew that these statements were false because they knew that they could continue their ongoing operations without a PPP loan.

114.    Defendants' statements in their applications for forgiveness that they complied with all the requirements of the PPP Rules were false. Defendants knew that these statements were false because they were ineligible for PPP loans and that they did not need the loans in order to support their ongoing operations.

115.    Defendants' false statements herein were material to their false and fraudulent claims for payment and approval made to the United States government in conjunction with their PPP applications. The statements also made the financial institutions' claims for payment and reimbursement of loan money false and were material to those false claims, as well.

116.    Defendants' false statements were material because the Government's lending agents—and by extension the United States Government itself—heavily relied on these certifications in processing PPP loans as quickly as possible with the assistance of an automated tool that itself would trust these certifications. Defendants' false statements thus not only had the natural tendency to influence the award and forgiveness of PPP loans but in fact did so.

117.    The United States Government, unaware of the material falsity of the claims made or caused to be made by Defendants due to these material statements, approved, paid, and participated in payments and forgiveness for loans that were not allowed.

118.    But for Defendants' use of the materially false statements, the PPP loans would not have been paid.

119.    Because of their false or fraudulent statements, Defendants earned millions of dollars through PPP loans to which they are not legitimately entitled. The ultimate submission to the federal Government of claims for payment was a foreseeable consequence of this fraud. As a result, the United States has suffered substantial damages and is entitled to recover treble damages and civil monetary penalties.

## X.    TABLE OF EXHIBITS

| Exhibit 1 | Watercolor Community-Articles of Incorporation |
|-----------|------------------------------------------------|
| Exhibit 2 | 2020 Watercolor Community Annual Report |
| Exhibit 3 | Holiday Surf Amended & Restated Articles of Incorporation |

| Exhibit 4 | 2020 Holiday Surf Annual Report |
| Exhibit 5 | 2020 Jetty East Annual Report |
| Exhibit 6 | Laketown Wharf-Articles of Incorporation |
| Exhibit 7 | Laketown Wharf 2020 Annual Report |
| Exhibit 8 | One Seagrove 2020 Annual Report |
| Exhibit 9 | Pinnacle Port 2020 Annual Report |
| Exhibit 10 | Rosemary Beach-Articles of Incorporation |
| Exhibit 11 | Rosemary Beach 2020 Annual Report |
| Exhibit 12 | Seacrest Beach 2020 Annual Report |
| Exhibit 13 | St. George Restated Articles of Incorporation |
| Exhibit 14 | St. George 2020 Annual Report |
| Exhibit 15 | (Native) Watercolor Appraisal District Info |
| Exhibit 16 | Watercolor Updated Resort Map |
| Exhibit 17 | Holiday Surf & Racquet Club Assignments |
| Exhibit 18 | Jetty East Assignments |
| Exhibit 19 | Laketown Wharf Assignments |
| Exhibit 20 | Laketown Wharf 2020 Budget |
| Exhibit 21 | One Seagrove Financing Documents |
| Exhibit 22 | Pinnacle Port Assignments |
| Exhibit 23 | Rosemary Beach Assignments & Mortgage |
| Exhibit 24 | (Native) Rosemary Beach Appraisal District Info |
| Exhibit 25 | St. George Financing Documents |

## XI.    PRAYER FOR RELIEF

120.    WHEREFORE, Relator respectfully requests the Court enter judgment against Defendants for violations of the FCA and award the following:

    a.  Damages in the amount of three times the actual damages suffered by the United States as a result of Defendants' conduct;

    b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

    c.  The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

    d.  All costs and expenses of the litigation, including attorneys' fees and costs of court; and

    e.  All other relief on behalf of Relator or the United States that the Court deems just and proper.

## XII.    DEMAND FOR JURY TRIAL

121.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.


Respectfully submitted,

Randall C. Owens

Randall C. Owens
State Bar No. 15380700
Michael Adams-Hurta
State Bar No. 24097860
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Telecopier: (713) 572-4320
owens@wrightclosebarger.com
hurta@wrightclosebarger.com
*Attorneys for Relator Wade Riner*

37

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2024, a true and correct copy of this First Amended Complaint was served on other parties through e-filing.

*/s/ Michael Adams-Hurta*
Michael Adams-Hurta